UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JASON BOYD SMITH, | § | No. 5:15-CV-493-DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| MARIA ANGELINA TULLIS and | § | |
| GERALDO MORALES REYNA, | § | |
| | § | |
| Defendants. | § | |

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR
SUMMARY JUDGMENT

Before the Court is a Motion for Summary Judgment filed by

Defendants Maria Angelina Tullis and Geraldo Morales Reyna (collectively, the

"Defendants").  (Dkt. # 32.)  On November 22, 2016, the Court heard argument on

the motion: John T. Flood, Esq. appeared on behalf of Plaintiff Jason Boyd Smith

("Plaintiff" or "Smith"), and Charles S. Frigerio, Esq. appeared on behalf of the

Defendants.  After careful consideration of the memoranda filed in support of and

in opposition to the pending motion, as well as the arguments made at the hearing,

the Court, for the reasons that follow, **GRANTS IN PART** and **DENIES IN**

**PART** the Motion for Summary Judgment (Dkt. # 32).

1

<u>BACKGROUND</u>

This case arises out of a series of events, culminating in an incident at the Frio County Clerk's Office (the "Frio Clerk's Office") that resulted in Plaintiff's arrest two years later.

I.      <u>The Frio County Clerk's Office</u>

To understand this case, it is necessary to review the functions, responsibilities, and operations of the Clerk's Office.  The Frio County Clerk is Plaintiff Maria Angelina Tullis ("Clerk Tullis"), and her two deputy clerks are Monica Segovia ("Segovia") and Esmeralda Cano ("Cano").  Like almost any county clerk's office, the Frio Clerk's Office is the repository of all official records filed and maintained in Frio County.  Such records include, *inter alia*, land deeds, birth certificates, death certificates, and juvenile criminal records.  ("Cano Dep.," Dkt. # 32-6 Ex. D at 10:10−11:17.)  When an individual files an official public record ("OPR") such as a land deed, birth certificate, or death certificate, the document is scanned and turned into a digital image.[1]  ("Tullis Dep.," Dkt. # 36-16 at 94:7−94:10.)  However, Frio Clerk's Office employees give contradictory testimony about whether the actual juvenile records are digitized or kept solely in

---

[1] Under Texas law, birth records become public information on and after the 75th anniversary of the date of birth and death records become public information on and after the 25th anniversary of the date of death.  Tex. Gov't Code § 552.115(a)(1)−(2). Otherwise, such records are considered confidential.

paper format.  (Compare "Segovia Dep.," Dkt. # 32-5 at 32:2−32:18 with "Cano Dep." at 11:7−12:5 and 13:21−14:1.)  Unlike OPRs, juvenile records are confidential, not public information, and thus segregated from OPRs.  Tex. Code Crim. Proc. Ann. art. 44.2811.

To manage its records, the Frio Clerk's Office retained Local Government Solutions ("LGS") to install software called DataPoint.  ("Price Decl.," Dkt. # 36-7 at 1.)  DataPoint maintains a listing of information describing the digitized files recorded by the Frio Clerk's Office.  (Id.)  For example, when a Frio Clerk's Office employee scans a land deed into a digital image, that image is saved onto an "Image Server" and DataPoint automatically records information about that deed such as its legal description, instrument description, filing date, volume in which it was recorded, and whether a grantor or grantee filed it.  (Id.; Dkt. # 36-3.)  This information on DataPoint is commonly referred to as an index. (Price Decl.)  Frio County managed the "Imager Server" on which all OPRs were saved, ("McKenzie Dep.," Dkt. 36-15 at 18:19−18:20) while LGS managed the server containing the index of those imaged files.  (Id.)

To facilitate the public's access to OPRs, the Frio Clerk's Office installed two computer terminals available to the public to search public records. (Tullis Dep. at 30:15−30:18.)  Using the DataPoint program on the public computer, a user could enter a date range for a particular type of document, hit the

search button, and see an index of all relevant documents.  (McKenzie Dep. at 48:10−17.)  Once an index was populated, a user could print the index and purchase it, or save the index as a digital file.  (Id. at 48:19−49:7.)  However, LGS installed a restricted version of DataPoint on the public computers, which prevented the public-user from accessing restricted files and confidential information through DataPoint, such as juvenile records, and certain birth and death records.[2]  (Price Decl. at 2; McKenzie Dep. at 29:3−30:10; 40:10−22.)  Nevertheless, depending on the security maintained on the Image Server by the Frio Clerk's Office, a user of the public terminal could, at least in theory, access the digital images of OPRs and confidential records by navigating to the mapped shared drive containing those images.  (McKenzie Dep. at 101:6−104−22.)  While neither party has submitted evidence to demonstrate exactly what security measures existed at the relevant time period that would prevent a public-user from accessing the Image Server through the public computers, Clerk Tullis has testified that the public computers are password protected and thus cannot access juvenile and other protected records.  (Tullis Dep. at 56:25−57:8.)

II.    TexasFile's Public Access to Information Requests

Plaintiff is the president of TexasFile, a company in the business of obtaining land deeds from Texas counties, and then selling those records to

---

[2] LGS installed a "full-access" version of DataPoint on computers used only by Frio Clerk's Office staff.

customers for one dollar per page from its website. ("Smith Dep.," Dkt. # 36-14 at

14:21−22; 20:5−18.)  On August 27, 2008, TexasFile sent a public information

request, pursuant to Chapter 552 of the Texas Government Code, to the Frio

Clerk's Office seeking an electronic copy of "any real property documents and/or

indices that are maintained in digital form."  (Dkt. # 36-8 at 2.)  Clerk Tullis

responded to the request that her office sold CDs containing the digital images of

the real property records, but was unable to provide the indices of those records in

a digital format.  (Tullis Dep. at 76:15−78−6.)  Clerk Tullis testified that while the

Frio Clerk's Office had the capability to produce digital indices through DataPoint,

her employees did not know how to extract the indices into a useable digital

format.  (Id. at 79:18−80:3.)  On September 2, 2009, and September 22, 2011,

TexasFile sent additional public information requests to the Frio Clerk's Office

seeking the same electronic copies of recorded real property indices that are

maintained in digital form.  (Dkt. # 36-8.)  In response to these requests, Clerk

Tullis testified that she let TexasFile know that OPR images were available on

CDs, but that indices were only available on paper.  (Tullis Dep. 90:1−92:20.)

Plaintiff's testimony corroborates Clerk Tullis' testimony.  (Smith Dep. at

28:12−15.)  Plaintiff testified that without the digital indices, his customers could

not search the Frio County property records on his company's website.  (Id. at

28:18−25.)

III.    The Incident

On July 18, 2012, Plaintiff visited the Frio Clerk's Office seeking to obtain an electronic index for purchase. (Id. 33:18−22.) It is undisputed that Plaintiff accessed one of the public computers with the restricted version of DataPoint. However, the parties disagree on what happened next. Plaintiff testified that he accessed DataPoint, determined that the program could produce a digital index of Frio County's real property records, and then saved a copy of that index to the computer's desktop. (Id. 44:8−20.) Clerk Tullis testified that she observed Plaintiff on the public computer and "saw that the screen that he had on the computer was not something I recognized. It was letters, numbers that I had never seen before." (Tullis Dep. 129:9−12.) Clerk Tullis directed her deputy Segovia to investigate. (Id. 129:13−18.)

Segovia approached the public terminal and testified that she too did not recognize the screen because it was a different color than the typical DataPoint screen.[3] ("Segovia Dep.," Dkt. # 32-5 at 72:4−74:2.) Segovia asked Plaintiff what he was doing, and it is undisputed that Plaintiff tried to show Segovia what he was doing, and that the electronic index was available on the computer. (Id. at 75:17; Smith Dep. at 46:18−21; "Cano Dep.," Dkt. # 32-6 at 24:12−25:7.) Indeed,

---

[3] Segovia also testified that she observed Plaintiff remove a thumb-drive, an allegation that Plaintiff denies. For the purposes of this lawsuit, this allegation is immaterial because it was not presented to the Justice of the Peace in her determination of probable cause. (See "Reyna Dep.," Dkt. # 32-3 at 43:9−44:1.)

Segovia specifically testified that "[h]e said that he was trying to get an index out and he wanted to show us how we could do it." (Segovia Dep. at 81:24−25.) Segovia testified that she refused his assistance and informed him that LGS would train the Frio Clerk's Office staff how to export the digital index. (Id. 81:24−82:3.) Segovia further testified that Plaintiff told her that he had emailed some documents to himself (Id. at 89:21−90:1), but Plaintiff denies emailing anything and instead testified that he "specifically recall[s] explaining to [Segovia] how [the index] could be provided by email." (Smith Dep. at 46:9−10.) Segovia then removed Plaintiff from the public computer "to make sure that he wasn't doing something that he was not supposed to be doing." (Segovia at 91:1−5.) Plaintiff and Segovia walked to the front desk, where Plaintiff identified himself by name and that he was either the CEO or president of TexasFile. (Tullis Dep. at 130:4−11; Smith Dep. at 55:13−56:8.) Segovia and Plaintiff continued to argue over whether the Frio Clerk's Office would provide him a copy of the electronic public index.[4] (Segovia Dep. at 92:10−15.) Plaintiff then left the office.

After Plaintiff left, Clerk Tullis testified that,

I thought about it. And I said, we don't know what he took. We don't know what he extracted from our public computer. Do we know that this man could do something, you know, hack our computers and take all our records? Is he somebody from the outside, you know? We didn't know. And I said, he just stole all my records. And I got real

---

[4] It is undisputed that the electronic index is a public record of which Plaintiff, and any Texas citizen, had a right of access.

upset.  And I said, somebody has just stole [sic] all our records
without our knowledge, you know.  What did he take?  Was this a
knowledgeable person that knew how to hack into the computer and
get all our documents? Did he take all our births, did he take all our
juveniles, did he take all our marriages, deaths? And so we didn't
know.  So I got real nervous and I said, we need to report this to
somebody.  So we reported it.

(Tullis Dep at 131:3−18.)  When asked "[b]efore reaching that conclusion, tell the

folks on the jury, and the judge, all of the investigation you did before reaching the

conclusion that Mr. Smith had . . . stolen all [your] records."  (Id. at 133:8−11.)

Clerk Tullis answered, "[b]ecause he was at a site that I did not recognize.  And I

don't know how much knowledge this young man had [of] computers, or what he

had taken from [the public computer].  I had no knowledge.  And to this day, I

don't know what he took."  (Id. at 133:12−17.)

        As a result of Clerk Tullis' concerns, her office contacted co-

defendant Geraldo Morales Reyna ("Sheriff Reyna) of the Frio County Sheriff's

Department.  ("Reyna Dep.," Dkt. # 32-3 at 34:2−11.)  During his investigation,

Sheriff Reyna testified that he took Clerk Tullis' statement (id. at 38:10), found no

evidence that Plaintiff took anything (id. at 40:10−11), saw the digital index that

Plaintiff saved onto the desktop (id. at 58:21−59:6; see "Digital Index," Dkt. # 36-

3 Ex. 2), did not have the public computer forensically investigated (Reyna Dep. at

40:21−23), was never told what records were allegedly stolen (id. at 51:24−52:8),

never investigated whether Plaintiff actually emailed documents to himself (id. at

59:23−25), never investigated the allegation that Plaintiff allegedly used a thumb-drive on the public computer (id. at 55:21−56:7), and never interviewed Plaintiff (id. 41:4−10.)

Meanwhile, on July 20, 2012, Plaintiff sent a letter to the Attorney General of Texas requesting assistance in obtaining an electronic index from the Frio Clerk's Office.  (Dkt. # 32-10.)  In the letter, Plaintiff summarized TexasFile's repeated public information requests for electronic indices of the Frio County public property records, explained that he had accessed a public computer two days prior, saved a couple years of Frio County electronic index records, and briefly described that the Frio Clerk's Office refused to provide him an electronic copy of the indices.  (Dkt. # 32-10.)  In response, the Frio Clerk's Office retained counsel to defend its actions.

IV.   The Probable Cause Determination and Arrest

On August 14, 2012, Clerk Tullis gave a signed, written statement to Sheriff Reyna describing the incident with Plaintiff.  Clerk Tullis wrote in whole,

> On July [] 2012 a gentlemen walked into our office and went to the vault where our records [and] OPRs are stored.  After a while he came back into our front office and wanted to know if we had the indexes in CDs.  Monica Segovia proceeded to tell him no, not at this time.  He went back to the public computer and started to look for records, as I went to the back room I noticed he was not on the site of our OPR records.  He had another (unfamiliar to me) screen up and was typing in something.  I came back and told Monica I think he is somewhere he is not suppose [sic] to be.  Monica got up and

> stood behind him and observed what site he was in and told him
> he had no right to be there.  He told Monica I just sent all this
> information to myself through email.  Monica asked him to
> please come to the front desk to talk to us.  He came and
> proceeded to tell us how he had done it and who he was.  He
> said he was Jason CEO and owner of TexasFile.  He fumbled
> through his suitcase but never gave us his card, either he could
> not find it or did not want to give us his card.  Monica informed
> him that he had no right to be at that site where he was.  He
> informed us as he was walking out that he was going to let the
> Attorney General [know] that we would not give or sell him
> indices.  As of today we don't know what he took from our
> computer.  Some of our records are confidential like deaths,
> juveniles, and births.

("Tullis Statement," Dkt. # 36-4 at 5−6.)  On October 5, 2012, Frio County

Attorney Hector Lozano ("Lozano") determined that probable cause existed to file

criminal charges of theft or tampering with a governmental record against Plaintiff.

(Dkt. # 32-4 at 2.)  Lozano based his probable cause determination, at least in part,

on the fact that Segovia alleged to have seen Plaintiff remove a flash drive from the

public computer.  (Id.)

On October 10, 2012, Clerk Tullis signed a criminal complaint under

oath that she had "personal knowledge" that Plaintiff "intentionally or knowingly

possesse[d] a governmental record to-wit: FRIO COUNTY CLERK OFFICIAL

PUBLIC RECORDS OPR Record (Death Juveniles and Birth Certificates, with

knowledge that it was obtained unlawfully." ("Complaint," Dkt. # 36-4 at 9.)  The

Complaint states that such conduct violates Texas Penal Code § 37.10, a third

degree felony.

10

Sheriff Reyna took Clerk Tullis' written statement, a narrative he had typed which is substantially similar to Clerk Tullis' statement, and Clerk Tullis' sworn complaint form to a court clerk. (Reyna Dep. at 109:16−20.) Notably, Sheriff Reyna testified that he had no evidence Plaintiff possessed any confidential record and had no evidence that Plaintiff possessed anything with the knowledge that it was obtained unlawfully. (Id. 102:1−20.) On October 12, 2012, the Justice of the Peace signed an arrest warrant for Plaintiff based on the three documents provided. (Dkt. # 36-12.) Plaintiff was not immediately arrested.

Two years later, on June 21, 2014, Plaintiff arrived at the international terminal in the Houston International Airport returning from a trip to Buenos Aires, Argentina. (Smith Dep. at 76:14−22.) Law enforcement boarded the plane and arrested Plaintiff based on the Frio County warrant. (Id. at 77:24−79:19.) Plaintiff subsequently spent four days and three nights in a series of jails in the Houston area. (Id. at 103:10−12.) Plaintiff posted bond and on July 21, 2014, Assistant District Attorney Robert Lipo of the 81st Judicial District declined to prosecute Plaintiff because "[t]here is insufficient evidence to prosecute Mr. Smith for tampering with a governmental record. Additionally, there were no factual allegations in the complaint signed by Ms. Tullis that established probable cause to issue an arrest warrant for Mr. Smith." (Dkt. # 36-13.)

V.     The Instant Lawsuit

On June 15, 2015, Plaintiff filed this lawsuit against Clerk Tullis and

Sheriff Reyna.  (Dkt. # 1.)  On February 19, 2016, Plaintiff filed his First Amended

Complaint asserting four causes of action against each Defendant: (1) a violation

of his Fourth Amendment right to be free from unreasonable seizure absent

probable cause pursuant to 42. U.S.C. § 1983; (2) a violation of his Fourteenth

Amendment due process rights pursuant to 42 U.S.C. § 1983; (3) malicious

prosecution under Texas law; and (4) intentional infliction of emotional distress.

(Dkt. # 19.)

On August 10, 2016, Defendant filed a Motion for Summary

Judgment asserting the affirmative defense of qualified immunity.  (Dkt. # 32.)

Plaintiff filed a Response (Dkt. # 36) and Defendants filed a Reply (Dkt. # 37.)

## LEGAL STANDARD

A movant is entitled to summary judgment upon showing that "there

is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a); see also

Meadaa v. K.A.P. Enters., L.L.C., 756 F.3d 875, 880 (5th Cir. 2014).  A dispute is

only genuine "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this burden, the nonmoving party must come forward with specific facts that establish the existence of a genuine issue for trial.  Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621 (5th Cir. 2000)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

In deciding whether a fact issue has been created, the court must draw all reasonable inferences in favor of the nonmoving party, and it "may not make credibility determinations or weigh the evidence."  Tiblier v. Dlabal, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).  However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."  United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003)).

13

DISCUSSION

The Court begins by noting that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process must be the guide for analyzing these claims.'"  Cuadra v. Hous. Indep. Sch. Dist., 626 F.3d 808, 814 (5th Cir. 2010) (citing Albright v. Oliver, 510 U.S. 266, 273 (1994) (internal citations omitted)).  In Albright, the Supreme Court held that a plaintiff's claims based on prosecution without probable cause were best analyzed under the Fourth Amendment, as the "Framers [of the Constitution] considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it."  510 U.S. at 274.  Accordingly, the Court will only analyze Plaintiff's claim through the Fourth Amendment and will not address his Fourteenth Amendment claim.

I.     Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly

14

incompetent or those who knowingly violate the law."  Thompson v. Mercer, 762 F.3d 433, 436−37 (5th Cir. 2014).

Once a defendant raises qualified immunity as a defense, the burden shifts to the plaintiff to show a violation of a clearly established constitutional right.  Harris v. Serpas, 745 F.3d 767, 771 (5th Cir. 2014).  Accordingly, when a defendant pleads qualified immunity as an affirmative defense and moves for summary judgment, a court must decide: "(1) whether the undisputed facts and the disputed facts, accepting the plaintiff's version of the disputed facts as true, constitute a violation of a constitutional right; and (2) whether the defendant's conduct was objectively reasonable in light of clearly established law."  Carroll v. Ellington, 800 F.3d 154, 169 (5th Cir. 2015).  A court may determine these questions in any order.  See Pearson v. Callahan, 555 U.S. 223, 236 (2009).  As to the second prong, a government official's acts are not objectively unreasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the plaintiff's rights.  Carroll, 800 F.3d at 169.

A.    Objective Reasonableness in Light of Clearly Established Law

As is the Court's discretion, the Court begins by analyzing the second prong of the qualified immunity analysis.  Pearson, 555 U.S. at 236.  "As a general matter, it is beyond question that [a person] has a clearly established constitutional

right to be free from arrest absent an arrest warrant or probable cause." <u>Freeman v.</u>
<u>Gore</u>, 483 F.3d 404, 411 (5th Cir. 2007).

     1.  <u>Clerk Tullis' Liability</u>

        In 2012, it was clearly established law that "[a] governmental official
violates the Fourth Amendment when he [or she] deliberately or recklessly
provides false, material information for use in an affidavit in support of a search
[or arrest] warrant." <u>Hart v. O'Brien</u>, 127 F.3d 424, 449 (5th Cir. 1997).  In the
context of § 1983 claims asserting Fourth Amendment violations, a governmental
official is "liable for swearing to false information in an affidavit in support of [an
arrest] warrant, provided that: (1) the affiant knew the information was false or
[acted with] reckless disregard for the truth; and (2) the warrant would not
establish probable cause without the false information." <u>Hart</u>, 127 F.3d at 442
(citing <u>Franks v. Delaware</u>, 438 U.S. 154, 171 (1978)).  "To prove reckless
disregard for the truth [a plaintiff] must present evidence that [the defendant] 'in
fact entertained serious doubts as to the truth' of the relevant statement." <u>Hart</u>, 127
F.3d at 449 (quoting <u>St. Amant v. Thompson</u>, 390 U.S. 727, 732 (1968));
<u>Melton v. Phillips</u>, --- F.3d ---, 2016 WL 4895989, at *2 (5th Cir. 2016).  "Whether
a defendant in fact entertained serious doubts as to the truth is necessarily a fact
question." <u>Melton</u>, 2016 WL 4895989 at *5.

The Court has no trouble in concluding that Clerk Tullis acted with objective unreasonableness in light of this clearly established law because she swore to false facts in reckless disregard of the truth.  Clerk Tullis signed a criminal complaint form under oath that she had "personal knowledge" that Plaintiff unlawfully possessed Frio County OPRs and confidential juvenile and birth records.  (Dkt. # 36-4 at 9.)  However, Clerk Tullis gave undisputed testimony that she lacked such personal knowledge at the time she made this sworn statement.  For example, Clerk Tullis gave the following deposition testimony:

> A: I have no idea what he stole.
>
> Q: And you didn't when you swore to the affidavit, right?
>
> A: I don't know what he stole.
>
> . . .
>
> Q: When you swore to the affidavit, you speculated as to what had happened?
>
> A: Yes.  Because I didn't know what he took.
>
> Q. Right.
>
> A. And I was scared. Yes.

(Tullis Dep. at 139:6−23.)  This undisputed testimony establishes a genuine issue of material fact that Clerk Tullis entertained serious doubts as to whether Plaintiff unlawfully took any record from the Frio Clerk's office, and thus swore to false facts in reckless disregard to the truth.  Indeed, Clerk Tullis has no personal

knowledge or proof that Plaintiff stole any record.  Accordingly, Clerk Tullis is not entitled to qualified immunity.

### 2. Sheriff Reyna

In 2012, it was clearly established that a police officer was not entitled to absolute immunity for causing a plaintiff "to be unconstitutionally arrested *by presenting* a judge with a complaint and a supporting affidavit which failed to establish probable cause."  Malley v. Briggs, 475 U.S. 335, 337 (1986) (emphasis in original).  No party disputes that Sheriff Reyna presented the application for the arrest warrant to the court clerk for the Justice of Peace to sign.  Further, there is no genuine dispute that the factual allegations in the warrant application fail to establish probable cause.  Indeed, the Assistant District Attorney responsible for prosecuting the felony complaint against Plaintiff found that "there were no factual allegations in the complaint signed by Ms. Tullis that established probable cause to issue an arrest warrant for Mr. Smith."  (Dkt. # 36-13.)  To the extent that Clerk Tullis' voluntary statement indicates that Plaintiff emailed Frio County documents to himself, Sheriff Reyna has given undisputed testimony that at the time he applied for a warrant there was no evidence that Plaintiff did so.  (Reyna Dep. at 65:18−22.)  Accordingly, Sheriff Reyna is not entitled to absolute immunity.

Nevertheless, the Supreme Court made clear that a police officer may be entitled to qualified immunity if he acted with objective reasonableness in

deciding to apply for a warrant.  Malley, 475 U.S. at 345−46.  If the sworn facts in an officer's affidavit do not establish probable cause, then an "officer's application for a warrant [is] not objectively reasonable, because it create[s] the unnecessary danger of an unlawful arrest."  Id. at 345.  The Fifth Circuit has extended Malley liability to "an officer, who is not the affiant [but] who actually prepares the warrant application with knowledge that a warrant would be based solely on the document prepared."  Michalik v. Hermann, 422 F.3d 252, 261 (5th Cir. 2005). "Such an officer is in a position to see the whole picture, to understand his responsibility, and thus fully assess probable cause questions."  Id. at 261.

In this case, Sheriff Reyna was the sole investigating officer of the July 18, 2012 incident at the Frio Clerk's Office.  (Reyna Dep. at 46:3−21.) Sheriff Reyna testified that he prepared and delivered the entire warrant application provided to the Justice of the Peace: (1) he populated the cover sheet for the warrant application (id. at 98:19−101:16); (2) he approved the police narrative describing the July 18, 2012 incident (Dkt. # 36-4 at 3−4); (3) he typed the complaint form eventually signed by Clerk Tullis (Reyna Dep. at 101:17−25); (4) he took the complaint form to Clerk Tullis for her signature (id. 107:12−16); and (5) delivered the warrant application to the court for the Justice of the Peace to

sign (id. at 108:3−109:10).[5]  As mentioned above, there is no genuine dispute that the factual allegations in the warrant application do not establish probable cause that Plaintiff violated § 37.10.  (Dkt. # 36-13.)  Indeed, Sheriff Reyna testified that at the time he prepared and submitted the warrant application he had no evidence that Plaintiff possessed a Frio County record with knowledge that it was obtained unlawfully.  (Reyna Dep. at 102:1−20.)  As the sole investigator, Sheriff Reyna was the only officer who saw the entire picture and could fully assess probable cause.  His undisputed testimony that he had no evidence that Plaintiff committed a crime makes his decision to apply for a warrant application objectively unreasonable.

Nor can Sherriff Reyna rely on the good faith exception for the aforementioned reasons.  The Supreme Court has held the same good faith standard of "objective reasonableness" defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest." Malley, 475 U.S. at 344.  "Only where the warrant application is so lacking in indicia of probable cause as to render the official belief in its existence unreasonable, will the shield of immunity be lost."  Id. at 344−45 (citing United States v. Leon, 468 U.S. 897, 923 (1984).  Here, that is the case and more—Sheriff

---

[5] The only part of the warrant application that Sheriff Reyna did not prepare is a photocopy of the Tex. Penal Code § 37.10, and the hand-written statement by Clerk Tullis.  (Dkt. # 36-4.)

Reyna actually testified that he lacked probable cause, but elected to apply for a warrant nonetheless. Accordingly, Sheriff Reyna is denied qualified immunity.

II.   Independent Intermediary Doctrine

Defendants contend that despite their actions, the independent intermediary doctrine precludes their liability.  Under the independent intermediary doctrine, "even an officer who acted with malice in procuring the warrant . . . will not be liable if the facts supporting the warrant . . .  are put before an impartial intermediary such as a magistrate or a grand jury, for that intermediary's 'independent' decision 'breaks the causal chain' and insulates the initiating party." Melton, 2016 WL 4895989 at *5 (quoting Thomas v. Sams, 734 F.2d 185, 191 (5th Cir. 1984)); Buehler v. City of Austin, 824 F.3d 548, 554 (5th Cir. 2015). "However, this doctrine applies only when all of the facts are presented and the intermediary's decision is truly independent of the wrongfulness of the defendant's conduct." Melton, 2016 WL 4895989 at *5.  Under the "taint exception," "[a]ny misdirection of the magistrate or the grand jury by omission or commission perpetuates the taint of the original official behavior." Hand v. Gary, 838 F.2d 1420, 1428 (5th Cir. 1988); Buehler, 824 F.3d at 554−55.

A.   Justice of the Peace as Independent Intermediary

Defendants argue that the Justice of the Peace's decision to issue the arrest warrant breaks the chain of causation between their actions and the alleged

constitutional violation.  Defendants' argument misses the mark.  For example, in

Melton, the Fifth Circuit held that a judge's issuance of an arrest warrant did not

break the causal chain because the police officer-defendant "misrepresented the

facts, intentionally or recklessly, by falsely identifying the plaintiff as the

suspected assailant and thus tainted the county judge's decision."  2016 WL

4895989 at *5.  Likewise, a genuine issue of material fact exists as to whether

Clerk Tullis recklessly misrepresented the fact that she had personal knowledge

that Plaintiff did in fact intentionally possess a government record with knowledge

that it was obtained unlawfully.  (Tullis Dep. at 139:6−23.)  Sheriff Reyna was

complicit in this because he presented a warrant application with facts he knew

were unsupported by evidence.  (Reyna Dep. at 102:1−20.)  Accordingly, the Court

finds that the independent intermediary doctrine is inapplicable because the Justice

of the Peace's decision was tainted by these factual misrepresentations.

### B.  Frio County Attorney as Independent Intermediary

Defendants also argue that Frio County Attorney Lozano serves as an

independent intermediary because he reviewed the criminal investigation and

concluded that probable cause existed.[6]  (Dkt. # 32-4.)  Whether a county attorney

---

[6] Lozano is not a defendant to this action, but it is noteworthy that the factual
allegations he lists to support his probable cause determination were likely made
with reckless disregard to the truth.  For example, he states that Plaintiff was on an
"unauthorized site," yet no evidence exists of what site he accessed and whether it
was unauthorized.  He states that Plaintiff used a flash drive, but Sheriff Reyna

in Texas can serve as an independent intermediary for a finding of probable cause on a felony charge seems to be a matter of first impression in the Fifth Circuit.

Under Texas law, county and district attorneys have separate and distinct authorities and responsibilities.  A county attorney represents his county and the state in courts "below the grade of district court."  Tex. Code Crim. Proc. art. 2.02.  The court below a district court is the county court, and a county court has "exclusive original jurisdiction of misdemeanors." Tex. Gov't Code § 26.045(a).  A county attorney may only aid a district attorney in district court "when requested."  Tex. Code Crim. Proc. art. 2.02.  Accordingly, a county attorney may only bring misdemeanor charges.

In contrast, a district attorney represents the state "in all criminal cases in the district courts of his district."  <u>Id.</u> art. 2.01.  District courts have original jurisdiction in felony grade criminal cases.  <u>Id.</u> art. 4.05.  Accordingly, district attorneys have authority to bring felony charges.  In this case, Frio County is one of five counties that fall within the 81st Judicial District of Texas.  Tex. Gov't Code § 24.183.  Accordingly, any felony criminal conduct in Frio County may only be initiated by the district attorney for the 81st Judicial District.

testified that he had no evidence that a flash drive was used.  (Reyna Dep. at 56:3−7.)  He also attests that Plaintiff admitted to stealing records in his letter to the Texas Attorney General.  In that letter, Plaintiff stated that he searched an index of public records, and saved a couple indices of public records to the desktop.  No rational jury would conclude that Plaintiff's statements constitute an admission of theft.

The Fifth Circuit has held that a district attorney may qualify as an independent intermediary.  Cuadra, 626 F.3d at 812.  In Cuadra, a school official removed names from an official school record that tracked student drop-out data.  Id. at 810.  The district attorney sought and obtained a grand jury indictment charging that defendant with a third degree felony for making a false alteration to a government record.  Id. at 811; Tex. Penal Code § 37.10(c)(2).  The district attorney eventually dropped the charges and the defendant filed a 42 U.S.C. § 1983 claim asserting a violation of his Fourth Amendment rights from a wrongful arrest.  The Fifth Circuit held that "both [the district attorney] and the . . . grand juries qualified as independent intermediaries."  Id. at 813.

The Court finds that sufficient reasons exist to not extend Cuadra to qualify a county attorney as an independent intermediary for findings of probable cause of felony conduct.  First, the county attorney has attested that he reviews "criminal investigations conducted by law enforcement officers and determine[s] if there is probable cause to go forward with a criminal complaint and prosecution of the criminal case."  (Dkt. # 32-4 at 2.)  In Cuadra, the district attorney had statutory authority to seek an indictment for the felony offense.  Here, that is not the case.  While the county attorney may very well fulfill this role informally, there is no statutory basis for a county attorney to prosecute a felony complaint like the one charging Plaintiff under Texas Penal Code § 37.10.  Instead, a county attorney

represents the state on misdemeanor charges in courts below the district court.

Accordingly, since a county attorney cannot seek or prosecute felonious conduct, it

follows that a county attorney cannot serve as an intermediary like a district

attorney can for felony charges.  Indeed, the prosecuting district attorney in this

case found that probable cause did not exist that Plaintiff committed a crime.  (Dkt.

# 36-13.)

Second, the county attorney states that he is "the legal advisor for the

Frio County Officials."  (Id.)  Defendants in this case are Frio County officials, and

by admitting that he is their legal advisor, his decisions become insufficiently

independent and impartial to qualify him as an independent intermediary.  By

providing legal advice to these officials in the performance of their official duties,

the county attorney's attorney-client role creates a conflict of interest whereby any

probable cause determination for a felony charge made by a county attorney is not

sufficiently autonomous from the public official's unconstitutional conduct.

Accordingly, the county attorney does not qualify as an independent intermediary

where he finds probable cause that felonious conduct occurred.

III.   State Law Claims

Plaintiff has also asserted common law claims for malicious

prosecution and intentional infliction of emotional distress.  (Dkt. # 19 ¶¶ 70−71.)

Section 101.106(f) of the Texas Tort Claims Act provides in pertinent part:

25

> (f) If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only.

Tex. Civ. Prac. & Rem. Code § 101.106(f).  Thus, a defendant is entitled to dismissal under section 101.106(f) upon proof that the plaintiff's suit (1) was based on conduct within the scope of the defendant's employment with a governmental unit, and (2) could have been brought against the governmental unit under the Tort Claims Act.  Anderson v. Bessman, 365 S.W.3d 119, 124 (Tex. App. 2011).  The statute strongly favors dismissal of governmental employees.  Waxahachie Indep. Sch. Dist. v. Johnson, 181 S.W.3d 781, 785 (Tex. App. 2005).  Indeed, the Texas Supreme Court has held that Section 101.106 "foreclose[s] suit against a government employee in his individual capacity if he was acting within the scope of employment."  Franka v. Velasquez, 332 S.W.3d 367, 381 (Tex. 2011).

Plaintiff concedes that he has brought his claims against Defendants in their individual capacities.  (Dkt. # 36 at 20.)  Plaintiff also offers no evidence that Defendants were acting outside the scope of their official duties.  As such, these claims could have been brought against them in their official capacities.  Accordingly, Plaintiff may not bring these claims against Defendants in their individual capacities.  These claims will be dismissed with prejudice.

26

CONCLUSION

For the reasons explained above, the Court **GRANTS IN PART** and

**DENIES IN PART** Defendants' Motion for Summary Judgment (Dkt. # 32).  The

Court **DENIES** Defendants' qualified immunity and **DISMISSES WITH**

**PREJUDICE** all state law claims.

**IT IS SO ORDERED**

**DATE:** San Antonio, Texas, November 8, 2016.

_____

DAVID ALAN EZRA
UNITED STATES DISTRICT JUDGE